**CUYAHOGA COUNTY BOARD OF COMMISSIONERS, Appellee,**

v.

**The STATE of Ohio et al., Appellants.**

[Cite as *Cuyahoga Cty. Bd. of Commrs. v. State,* 162 Ohio App.3d 6, 2005-Ohio-2821.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 84305.

Decided June 9, 2005.

Baker & Hostetler, L.L.P., Geoffrey S. Mearns, and Megan P. Frient, for appellee.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, Alan Schwepe, and Juliane E. Barone, Assistant Attorneys General, for appellants.

Peck, Schaffer & Williams, and Thomas A. Luebbers, for amicus curiae, County Commissioners Association of Ohio.

---

Rocco, Judge.

{¶ 1} A single bureaucrat with a briefcase can dispossess this state's most needy citizens more effectively than a hundred men with masks and guns. This paraphrase of the words of novelist Mario Puzo precisely summarizes the facts of this case.

{¶ 2} Defendants-appellants, the state of Ohio, the Ohio Department of Job and Family Services ("ODJFS"), the governor, and the director of ODJFS (collectively, "the state"), appeal from a common pleas court judgment following trial, which determined that the state had violated R.C. 5101.46 and the Ohio Constitution by transferring federal-block-grant funds into a special fund and then into the state's general revenue fund. The court declared the transfer null and void and ordered the state to return the transferred funds to the block-grant account from which they were transferred.

{¶ 3} The state urges that plaintiff-appellee, the Cuyahoga County Board of Commissioners (the "county"), lacks standing to challenge the transfer. It further claims that the court erred by holding that the transfer violated the Ohio Constitution and R.C. 5101.46 and abused its discretion by finding that there was insufficient evidence that the transferred funds constituted reimbursement for appropriate prior expenditures. Finally, the state asserts that the court order violates the doctrine of separation of powers by appropriating public funds.

{¶ 4} We find that the county has standing to pursue this action. We agree with the common pleas court that the budget legislation authorizing the transfer to the special fund is an unconstitutional attempt to amend R.C. 5101.46(H) and is therefore void. Furthermore, we agree with the common pleas court that the evidence was insufficient to demonstrate that the transfer represented a reimbursement for "earned federal" expenses incurred in prior years. Finally, we find that the court's order requiring the state to return the funds to the account from which they came did not violate the separation-of-powers doctrine. Accordingly, we affirm.

### Factual History

{¶ 5} In 1996, the United States Congress reformed Title IV–A of the Social Security Act, eliminating Aid to Families with Dependent Children ("AFDC") and replacing it with Temporary Assistance to Needy Families ("TANF"), a block-

grant program administered through the Department of Health and Human Services. The purpose of the TANF grants is to "increase the flexibility of States in operating a program designed to—(1) provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives; (2) end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage; (3) prevent and reduce the incidence of out-of-wedlock pregnancies and establish annual numerical goals for preventing and reducing the incidence of these pregnancies; and (4) encourage the formation and maintenance of two-parent families." Section 601(a), Title 42, U.S.Code.

{¶ 6} Federal law allows state recipients of TANF grants to use a limited[1] portion of the TANF funds to carry out state programs under other federal-block grants, most notably Title XX[2] of the Social Security Act. Section 604(d), Title 42, U.S.Code. Any funds transferred from TANF to Title XX programs "shall be used only for programs and services to children or their families whose income is less than 200 percent of the income official poverty line." Section 604(d)(3)(B), Title 42, U.S.Code.

{¶ 7} The state implemented TANF through two programs: Ohio Works First ("OWF") under R.C. Chapter 5107 and the Prevention, Retention and Contingency program ("PRC") under R.C. Chapter 5108. Both of these programs are administered by the ODJFS. See R.C. 5101.80(C)(7). The ODJFS has implemented these and other welfare-reform programs by entering into partnership agreements with every county in Ohio for the counties to administer the programs through their social services agencies, either directly or through third-party service providers.

---

1. Section 604(d)(1), Title 42, U.S.Code allows a state to transfer up to 30 percent of its TANF grant to carry out programs pursuant to Title XX and the Child Care and Development Block Grant Act. However, Section 604(d)(2), Title 42, U.S.Code limits the percentage of TANF funds that can be transferred to Title XX purposes to 4.25 percent for fiscal years 2001 and thereafter. Prior law allowed states to transfer up to ten percent of TANF funds to Title XX purposes. Federal appropriations legislation for fiscal years 2001 and thereafter has allowed states to transfer up to ten percent of TANF funds to Title XX purposes, notwithstanding the amendment to Section 604(d)(2), Title 42, U.S.Code.

2. Title XX funds are to be used "to furnish services directed at the goals of—(1) achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency; (2) achieving or maintaining self-sufficiency, including reduction or prevention of dependency; (3) preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests, or preserving, rehabilitating or reuniting families; (4) preventing or reducing inappropriate institutional care by providing for community-based care, home-based care, or other forms of less intensive care; and (5) securing referral or admission for institutional care when other forms of care are not appropriate, or providing services to individuals in institutions." Section 1397, Title 42, U.S.Code.

{¶ 8} Ohio received $728 million in TANF block grants annually from 1997 through 2001. It allocated ten percent per year, or $72.8 million, for use in Title XX programs. It is unclear precisely how these transfers were accomplished during those years, but we presume that they were made by the controlling board. Under R.C. 5101.46(H), the distribution and use of any TANF funds that "are transferred by the controlling board for use in providing social services under [Title XX]" are not subject to the rules governing distribution and use of funds received directly under Title XX. Instead, "[t]he department may do one or both of the following with the funds: (1) Distribute the funds to the county departments of job and family services; (2) Use the funds for services that benefit individuals eligible for services consistent with the principles of Title IV–A of the Social Security Act"—that is, TANF.

{¶ 9} Section 63.09 of the state's biennial budget for fiscal years 2002 and 2003 again required the ODJFS, in each fiscal year, to "transfer the maximum amount of funds from the federal TANF Block Grant to the federal Social Services Block Grant [Title XX] as permitted by federal law." However, the budget legislation then required ODJFS to draw $60 million "from TANF funds that were transferred into the Social Services Block Grant into State Special Revenue Fund 5Q8, in the Office of Budget and Management." The Director of Management and Budget could transfer any amount needed from this special revenue fund to balance the general revenue fund as of June 1, 2002, and 2003. Any funds remaining in the special fund thereafter would be returned to the TANF Block Grant Fund. 2001 Am.Sub.H.B. 94.

{¶ 10} The sum of $72.8 million was transferred from TANF to the Title XX Social Services Block Grant fund. Sixty million dollars of these funds were then transferred into Special State Fund 5Q8. The entire $60 million was transferred to the state general revenue fund on May 10, 2002.

Procedural History

{¶ 11} The county filed this action on September 19, 2001. Its complaint alleged that these transfers violated the partnership agreement with the county and R.C. 5101.46(H). It sought a permanent injunction to preclude the state from allocating TANF funds to non-TANF purposes as well as a declaratory judgment that the state must use the funds as required by R.C. 5101.46(H). The state immediately moved the court to dismiss the complaint because the county lacked standing. Apparently, the court denied this motion.[3] The state's motion for summary judgment and motion to dismiss for lack of subject matter jurisdic-

---

3. The docket sheet indicates that this motion was denied on March 29, 2002, but we were unable to find any written entry of that ruling.

tion were also denied. The matter then proceeded to a bench trial. During the trial, the court granted the state's motion for a directed verdict as to the county's claim for breach of contract. The county has not appealed that decision.

{¶ 12} The court issued its findings of fact and conclusions of law on February 10, 2004. The court concluded that the state had no authority to transfer TANF funds from the Title XX account to the special fund and then to the general revenue fund under any reading of R.C. 5101.46. It therefore found the transfer into the general revenue fund null and void and ordered the state to return the funds to the Title XX account.

## Law and Analysis

### Cuyahoga County Has Standing to Challenge the State's Transfer of TANF Funds from Title XX to the Special Fund to the General Revenue Fund.

{¶ 13} The state first argues that the county lacks standing to pursue this action. It urges that the county is not entitled to any part of the $60 million that was transferred out of the Title XX account, and therefore the county cannot establish that it suffered any concrete injury from the transfer.

{¶ 14} The county bore the burden of proving its standing to the trial court. To establish standing, the county had to demonstrate that it suffered a concrete injury, caused by the state's conduct, which was likely to be remedied by a favorable decision. *Wilmington School Dist. v. Clinton Cty. Bd. of Commrs.* (2000), 141 Ohio App.3d 232, 238, 750 N.E.2d 1141.

{¶ 15} The state contends that the county cannot prove a concrete right to a specific part of these funds. While that may be true, it is certain that the county would have received some part of these funds if the funds had not been transferred from the Title XX account into the special fund.[4] Under federal law, TANF funds transferred to Title XX purposes "*shall* be used *only* for programs and services to children or their families whose income is less than 200 percent of the income official poverty line." (Emphasis added.) Section 604(d)(3)(B), Title 42, U.S.Code. Thus, the funds must be used for such programs.

---

4. The state argues that the "consolidated allocation" system created by Section 63.15 of Am.Sub.H.B. 94 and Am.Sub.H.B. 299 results in a single allocation of monies to a county from various funding sources, including TANF and Title XX. Once the amount of the county's consolidated allocation is set, any change in the funds available to the ODJFS would not affect the county's allocation. However, had the TANF funds transferred to Title XX remained in the Title XX account as they should have, they would have been available for allocation by the ODJFS in the first instance. The single allocation for county departments of Job and Family Services is drawn from various "appropriation items," including the social-services block grant and TANF block grant. If the funds had remained in the social-services block grant, they would have been allocated to the counties, including Cuyahoga County.

{¶ 16} R.C. 5101.46(H) requires that TANF funds transferred to Title XX purposes be either distributed to county departments of Job and Family Services or used for services that benefit individuals eligible for services consistent with the principles of TANF. Whether the funds are distributed under the first or second of these provisions, it is clear that the funds ultimately will be distributed to county agencies. The first provision explicitly provides for distribution to county agencies, but even under the second provision, the funds will ultimately be distributed to counties because the "services" to which that provision refers are services under Title XX, and Title XX programs are implemented only through county agencies. See R.C. 5101.46(C).

{¶ 17} As a practical matter, Cuyahoga County agencies would have received a large portion of the funds had they remained in the Title XX account. Under R.C. 5101.46(C)(2), the formulae for distribution of the Title XX appropriations to local agencies must take into account "the total population of the area that is served by the agency, the percentage of the population in the area that falls below the federal poverty guidelines, and the agency's history of and ability to utilize Title XX funds." Cuyahoga County is the largest county in the state. Cleveland, which lies within its borders, was the poorest city in the nation in 2003, with a poverty rate of 31.3 percent.[5] The county itself is the second poorest in the state, with 15 percent of its population living below the poverty level.[6] Given these demographics, a substantial portion of the Title XX funds will presumably be transferred to Cuyahoga County agencies, although the precise amount cannot be predicted. Therefore, we find that the county was injured when the funds were transferred from the Title XX account to Special Fund 5Q8 and then to the general revenue fund, and it has standing to challenge the transfer.

The Budget Legislation Authorizing the Transfer Violated R.C. 5101.46(H) and Section 15(D), Article II, Ohio Constitution

{¶ 18} The state next asserts that the court erred by holding that the budget legislation authorizing this transfer was in conflict with R.C. 5101.46(H) and therefore impliedly amended that statute in violation of Section 15(D), Article II, Ohio Constitution. Section 15(D), Article II, requires that "[n]o law shall be revived or amended unless the new act contains the entire act revived, or the section or sections amended, and the section or sections amended shall be repealed." The state contends that there is no conflict between R.C. 5101.46(H) and the budget legislation because R.C. 5101.46(H) expressly limits the use of TANF funds that are "transferred by the controlling board" for use under Title

---

5. 2003 American Community Survey, United States Census Bureau.

6. Id. Lucas County is marginally poorer, with 15.4 percent of its population living below the poverty line.

XX, but the budget legislation (section 63.09 of Am.Sub.H.B. 94) did not involve the controlling board in the transfer of funds from TANF to Title XX.

{¶ 19} We find this to be a distinction without a difference. There is no reason to believe that the entity causing the transfer to occur should make a difference in how the funds can be used thereafter. The limits of Section 604(d)(3)(B), Title 42, U.S.Code on the use of TANF funds that have been transferred to Title XX purposes does not depend on how the state makes the transfer. R.C. 5101.46(H) is the only Ohio statute that implements Section 604(d)(3)(B), and it does not contemplate that a transfer from TANF to Title XX will occur in any way other than "by the controlling board." Consequently, we find that the limitations on the use of the funds transferred from TANF to Title XX must be the same whether the transfer is made by the controlling board or by the legislature itself. By transferring the funds from Title XX to the special fund, the state impliedly attempted to remove the restrictions contained in R.C. 5101.46(H), thus amending that statute in violation of Section 15(D), Article II of the Ohio Constitution. Accordingly, we overrule the second assignment of error.

Sufficiency of Evidence that Transferred Funds were Reimbursements for "Earned Federal" Expenses

{¶ 20} In its third assignment of error, the state argues that the common pleas court abused its discretion by finding insufficient evidence that the transfer of funds from the Title XX account into the special fund represented a reimbursement for previously incurred—so-called "earned federal"—expenses. It urges that the testimony of Quentin Potter, ODJFS's deputy director of fiscal services, supports this claim. The state contends that Potter's testimony establishes that the state expended at least $60 million for Title–XX–eligible expenses before the date the funds were transferred from the Title XX account to the special fund and that the transfer represented a reimbursement for these expenses.

{¶ 21} By focusing on the question whether there were unreimbursed "earned federal" Title XX expenses that this transfer could have reimbursed, the state's argument ignores the most critical question: did the legislature intend the transfer to reimburse "earned federal" expenses? The terms of Am.Sub.H.B. 94 do not demonstrate such an intent. There would be no need to hold a reimbursement in a special account for up to two fiscal years. Furthermore, under the terms of section 63.09 of Am.Sub.H.B. 94, any funds remaining in the special fund at the conclusion of state fiscal year 2003 were to be returned to the TANF account. If these funds were indeed a reimbursement, this provision would not make any sense. Therefore, we reject the state's argument that the transfer was intended as a reimbursement of earned federal expenditures previously made.

{¶ 22} Even if we accept that the legislature intended the transfer as a reimbursement of prior "earned federal" Title XX expenditures, and even if the

common pleas court were required to accept Potter's bald assertion that the state had Title–XX–eligible expenditures from before June 2001 that had never been reimbursed,[7] there was no evidence that these expenditures were eligible for reimbursement from TANF funds that were transferred to Title XX purposes. The use of TANF funds that are transferred to Title XX is strictly limited by Section 604(d)(3)(B), Title 42, U.S.Code. To demonstrate that its prior expenses were eligible for reimbursement from these funds, the state would have had to demonstrate that the expenses were incurred "for programs and services to children or their families whose income is less than 200 percent of the income official poverty line." The state did not make this showing. Therefore, the common pleas court did not err by finding the state's evidence insufficient.

The Court Did Not Violate the Separation of Powers Doctrine.

{¶ 23} Finally, the state argues that the common pleas court violated the separation of powers doctrine when it ordered the state to transfer the $60 million back to the Title XX account. The state characterizes this order as an "appropriation" and asserts that this ordered transfer is an exclusively legislative function.

{¶ 24} R.C. 131.01(F) defines appropriation as "an authorization granted by the general assembly to make expenditures and incur obligations for specific purposes." An appropriations bill necessarily must include a specific appropriation of public monies. *State ex rel. Akron Edn. Assn. v. Essex* (1976), 47 Ohio St.2d 47, 50, 1 O.O.3d 28, 351 N.E.2d 118. The court's order here does not require the state to set aside a specific amount of money to a specific purpose. It requires the state only to return funds improperly removed from its appropriated purpose. Therefore, the court order was not an appropriation and did not implicate the separation-of-powers doctrine.

Judgment affirmed.

SWEENEY, P.J., concurs.

CALABRESE, J., dissents.

---

7. Potter testified that the concept of "Title XX earned federal" expenses had never been used in Ohio before this transfer. He further testified that the historical expenditures for which he claimed the state was being reimbursed could have dated back as far as 1997. However, the only specific document to which he referred was the state's accounting of Title XX expenditures for fiscal year 2002, which reported that the state had almost $160 million in Title-XX-eligible expenditures from July 1, 2001 to June 30, 2002. These expenditures occurred largely after the July 15, 2001 transfer of the $60 million into the special fund and do not support the argument that the transfer reimbursed the state for prior expenditures. Therefore, Potter's testimony that the state had incurred "earned federal" expenses was uncorroborated.

CALABRESE, Judge, dissenting.

{¶ 25} I respectfully dissent from my learned colleagues in the majority. The appropriation of funds is a legislative function. The Ohio General Assembly enacted Section 63.09 of Am.Sub.H.B. No. 94. This was an appropriation measure made as part of the state's biennial budget. The trial court, by ordering the transfer of the $60 million back to ODJFS, took on a legislative function. I believe that this order was beyond the trial court's judicial boundaries; the most the trial court could have done was to declare Section 63.09 of Am.Sub.H.B. 94 invalid. The doctrine of separation of powers prevented the trial court from going further.

{¶ 26} The transferred funds in the case at bar were not supplied by the federal government for the purpose of providing welfare services. Rather, the federal government reimbursed Ohio for expenses that the state had already incurred in providing such services. Therefore, the $60 million belonged to the state, and the state was free to use the reimbursement funds as it determined.

{¶ 27} Accordingly, I would reverse and remand.